IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| TIERONE BANK, a United States Corporation, | ) ) ) | |
| Plaintiff, | ) ) | 4:07CV3199 |
| V. | ) ) | |
| HARTFORD FIRE INSURANCE COMPANY, a Connecticut Corporation, | ) ) ) ) | **MEMORANDUM AND ORDER** |
| Defendant. | ) ) ) | |

This matter is before the court on the parties' cross-motions for summary judgment. The question before the court is whether losses suffered by TierOne Bank ("TierOne") as a result of its involvement in a fraudulent real estate transaction are covered under a financial institution bond issued by Hartford Fire Insurance Company ("Hartford"). For the reasons set forth below, the court concludes that no coverage exists for TierOne under the bond. Accordingly, Hartford's motion for summary judgment is granted and TierOne's motion for partial summary judgment is denied.

**I. UNDISPUTED MATERIAL FACTS**

The following facts are undisputed:[1]

1.    TierOne is a United States corporation with its principal place of

---

[1] Facts set forth without citations may be found in the parties' Stipulation of Undisputed Facts. (Filing 27.)

business in the State of Nebraska.  (Filing 1 ¶ 1; Filing 10 ¶ 1.)

2. Hartford is a Connecticut corporation with its principal place of business in the State of Connecticut.  (Filing 1 ¶ 2; Filing 10 ¶ 2.)  Hartford sells insurance policies and bonds to entities in the State of Nebraska.  (Id.)

3. TierOne obtained a Financial Institution Bond (the "Bond") from Hartford covering the period from May 1, 2003, to May 1, 2006.  (Filing 1 ¶ 22; Filing 10 ¶ 22.)  The Bond contains a Fraudulent Mortgages Insuring Agreement Rider (the "Rider") which provides:

> To be attached to and form part of the Financial Institution Bond, Standard Form No. 24 No.91BBFCC5426 in favor of TierOne Bank
>
> It is agreed that:
>
> 1.   The attached bond is amended by inserting an additional Insuring Agreement as follows:
>
> Loss resulting directly from the Insured's having, in good faith and in the course of business in connection with any Loan, accepted or received or acted upon the faith of any real property mortgages, real property deeds of trust or like instruments pertaining to realty or assignments of such mortgages, deeds of trust or instruments which prove to have been defective by reason of the signature thereon of any person having been obtained through trick, artifice, fraud or false pretenses or the signature on the recorded deed conveying such real property to the mortgagor or grantor of such mortgage or deed of trust having been obtained by or on behalf of such mortgagor or grantor through trick, artifice, fraud or false pretenses.

(Filing 26.)

4. On April 25, 2005, TierOne entered into a Revised and Modified Line

of Credit Agreement by which it extended a "Warehouse Line of Credit" to US Money Source, d/b/a Soluna First ("USMS") in the amount of $10,000,000.00.[2] Under this arrangement, USMS would locate potential buyers of residential real estate and loan the buyers the funds necessary to purchase the property. USMS would take a note and a mortgage or deed of trust on the real estate to secure repayment of the loan. In order to obtain funds to loan the buyer for the purchase, USMS would request advances from TierOne on the Warehouse Line of Credit. USMS would assign the mortgage or deed of trust to TierOne and then sell the note and mortgage or deed of trust to an investor on the secondary market. USMS would then repay the advance that was made on the Warehouse Line of Credit, plus any applicable interest.

5.  This lawsuit concerns certain advances TierOne made to USMS under the Revised and Modified Line of Credit Agreement to fund two residential real estate loans from USMS to Bryan DePaola ("DePaola"). USMS's purpose for making these loans was to fund DePaola's purchase of two properties, one located in Seattle, Washington, and the other located in Mercer Island, Washington.

6.  On March 15, 2006, DePaola, as buyer, entered into purchase agreements with David Hawkins ("Hawkins") of Pacific Beach Mortgage ("Pacific Beach") for the purchase of the Seattle and Mercer Island properties.

7.  Hawkins and Pacific Beach asserted ownership of these properties based upon invalid non-consensual liens which Hawkins recorded against the properties. Hawkins recorded the non-consensual liens after becoming disgruntled as a result of a real estate dispute and the legal proceedings involving that dispute.

8.  Contrary to Hawkins' and Pacific Beach's representations, they did not

---

[2] Warehouse Lines of Credit are used as tools for banks to provide interim, short-term financing to mortgage originators such as USMS.

own the properties. The Seattle property was actually owned by a Washington Court of Appeals Judge who wrote an appellate opinion ruling against Hawkins in one of the lawsuits he filed with regard to the real estate dispute. The Mercer Island property was owned by the president of the successor to the savings and loan association which was one of the adverse parties in Hawkins' real estate dispute.

9. In 1994, the owners of the Seattle and Mercer Island properties obtained court orders declaring Hawkins' liens against the properties invalid, ordering them to be stricken and enjoining Hawkins from taking any action to enforce the liens. Despite the court orders, Hawkins purported to foreclose the liens and transfer title to the properties to Pacific Beach.

10. As part of the agreement between Hawkins and DePaola regarding the sale of the properties, Hawkins and DePaola entered into written trust agreements by which Hawkins established trust accounts that contained sufficient funds to pay the monthly principal and interest payments in regard to the properties for fifteen months. The funds were going to be used to pay the monthly principal and interest payments for that period of time. DePaola was told that he would not be required to make the loan payments for the first twelve to fifteen months. (Filing 31-3, DePaola Dep. 34:8-15, at CM/ECF p. 12.)

11. The trust agreements additionally provided that Pacific Beach should (1) arrange for the sale or refinancing of the properties within twelve months, (2) in any event, cause the sale or refinancing of the properties within fifteen months and (3) take all necessary lawful actions to insure that DePaola's interests and obligations should terminate within the twelve-to fifteen-month period. (Filing 27, Stipulation of Undisputed Facts, Exs. G, H.)

12. As a further part of the purchase agreements, Hawkins agreed to pay DePaola $15,000.00 per property from the funds in the trust accounts at the closing

of the sale of each property and another $10,000.00 per property if the properties were resold. The purpose of these payments was to compensate DePaola for obtaining the loans for the properties. (DePaola Dep. 26:7-28:5, at CM/ECF p. 11.)

13. DePaola applied for two asset-based loans from USMS to fund his purchase of the properties from Pacific Beach. DePaola's loan applications contained inaccurate information as they overstated the amount of DePaola's assets. DePaola was aware of the inaccurate statements on the loan applications at the time he signed them.

14. Based upon the asset amounts listed in the loan applications, DePaola appeared to qualify for the loans on the properties in accordance with the requirements of USMS for those types of loans. USMS approved the loan requests based upon the information it had been provided.

15. On April 3, 2006, Pacific Beach signed two statutory warranty deeds conveying its title and interest in the properties to DePaola. The statutory warranty deeds for the properties from Pacific Beach to DePaola are invalid as Pacific Beach did not have good title to either of the properties. Thus, DePaola did not acquire good title to the properties.

16. On April 3, 2006, DePaola signed two adjustable rate notes with USMS relating to his purported purchase of the properties. On that date, DePaola also signed two deeds of trust in regard to the properties in favor of USMS as lender. The deeds of trust signed by DePaola are defective and invalid.

17. At the time of the loan transactions, DePaola was employed as a loan officer working primarily on residential refinances. (DePaola Dep. 9:23-11:17, at CM/ECF pp. 6-7.) DePaola was familiar with the basic elements of residential real estate transactions, such as the use of promissory notes to finance purchases and

deeds of trust to provide security for the lender on the notes. (DePaola Dep. 21:9-24, at CM/ECF p. 9.) DePaola was aware that promissory notes and deeds of trust are legally binding documents. (DePaola Dep. 22:17-22, at CM/ECF p. 10.)

18. Pursuant to its Warehouse Line of Credit with TierOne, on or about April 5, 2006, USMS sent two funding requests to TierOne requesting $747,500.00 to finance DePaola's loan on the Seattle property and $812,500.00 to finance DePaola's loan on the Mercer Island property. In accordance with the Warehouse Line of Credit, TierOne approved both funding requests on April 5, 2006, and forwarded the funds.

19. USMS and TierOne did not become aware of any fraud relating to the Seattle or Mercer Island properties until sometime after the funding transfer.[3]

20. TierOne suffered a loss as a result of its involvement in the transactions relating to the Seattle and Mercer Island properties.

21. On or about May 25, 2006, TierOne provided Hartford with a notice of claim which provided Hartford notice of TierOne's claims under the Bond relative to the funding provided to DePaola. (Filing 1 ¶ 23; Filing 10 ¶ 23.) TierOne provided Hartford with a formal claim under the Bond and a proof-of-loss form on or about October 2, 2006. (Filing 1 ¶ 25; Filing 10 ¶ 25.) On January 22, 2007, Hartford

---

[3] On December 14, 2007, a jury in the United States District Court for the Western District of Washington, Case No. CR06-0280, convicted Hawkins of one count of conspiracy to commit wire fraud and two counts of wire fraud, in violation of 18 U.S.C. §§ 2, 1343 and 1349 in connection with the loans on the properties. The government has not charged DePaola with any crime relating to the transactions involving the properties. (Filing 32, Br. Supp. Pl.'s Mot. Summ. J. at CM/ECF p. 13.) Hartford maintains, however, that DePaola participated in the fraudulent scheme undertaken by Hawkins. (Filing 29, Br. Supp. Def.'s Mot. Summ. J. at CM/ECF p. 38.)

notified TierOne that it was denying TierOne's claim. (Filing 1 ¶ 26; Filing 10 ¶ 26.)

22.   On July 30, 2007, TierOne instituted this action for breach of contract and declaratory relief alleging that Hartford breached the terms of the Bond by refusing to provide coverage for the losses TierOne sustained as a result of its involvement in the transactions relating to the properties. (Filing 1.)

## II. ANALYSIS

### A. Summary Judgment Standard

Summary judgment should be granted only "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). *See also Egan v. Wells Fargo Alarm Servs.*, 23 F.3d 1444, 1446 (8th Cir. 1994). It is not the court's function to weigh evidence in the summary judgment record to determine the truth of any factual issue. *Bell v. Conopco, Inc.*, 186 F.3d 1099, 1101 (8th Cir. 1999). In passing upon a motion for summary judgment, the district court must view the facts in the light most favorable to the party opposing the motion. *Dancy v. Hyster Co.*, 127 F.3d 649, 652 (8th Cir. 1997).

In order to withstand a motion for summary judgment, the nonmoving party must substantiate their allegations with "sufficient probative evidence [that] would permit a finding in [his] favor on more than mere speculation, conjecture, or fantasy." *Moody v. St. Charles County*, 23 F.3d 1410, 1412 (8th Cir. 1994) (*quoting Gregory v. City of Rogers*, 974 F.2d 1006, 1010 (8th Cir. 1992)). "A mere scintilla of evidence is insufficient to avoid summary judgment." *Id.* Essentially, the test is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

## B. Coverage under the Bond

Hartford maintains that it is entitled to summary judgment because, relying upon the language of the Rider, the undisputed facts demonstrate that the Bond issued by Hartford does not provide coverage for TierOne's losses. (Filing 29.) Conversely, TierOne contends that partial summary judgment should be entered in its favor because, under the plain and ordinary meaning of the Rider, its losses are covered. (Filing 32.)

Under Nebraska law, a policy of insurance is a contract, the meaning of which is a question of law for the court. *Poulton v. State Farm Fire & Cas. Cos.,* 267 Neb. 569, 572, 675 N.W.2d 665, 669 (2004). The contract should be construed as a whole and effect given to every part thereof. *Guerrier v. Mid-Century Ins. Co.,* 266 Neb. 150, 153, 663 N.W.2d 131, 135 (2003). When the terms of an insurance contract are clear, they are to be afforded their plain and ordinary meaning, as a reasonable person would understand them. *Id.* at 153, 663 N.W.2d at 134. "[A] contract written in clear and unambiguous language is not subject to interpretation or construction and must be enforced according to its terms." *Boutilier v. Lincoln Benefit Life Ins. Co.,* 268 Neb. 233, 237, 681 N.W.2d 746, 750 (2004).

A court interpreting a contract, such as an insurance policy, must first determine, as a matter of law, whether the contract is ambiguous. *Reisig v. Allstate Ins. Co.,* 264 Neb. 74, 81, 645 N.W.2d 544, 550 (2002). "A contract is ambiguous when a word, phrase, or provision in the contract has, or is susceptible of, at least two reasonable but conflicting interpretations or meanings." *Id.* The fact that parties to a document have or suggest opposing interpretations of the document does not necessarily compel the conclusion that the document is ambiguous. *Tighe v. Combined Ins. Co. of America,* 261 Neb. 993, 999, 628 N.W.2d 670, 675 (2001). "The language of an insurance policy should be read to avoid ambiguities, if possible, and the language should not be tortured to create them." *Reisig,* 264 Neb. at 81, 645

N.W.2d at 550.

In interpreting limitations and exclusions in an insurance policy, the Nebraska Supreme Court has stated:

> An insurance policy is a contract between the insurance company and the insured. As such, the insurance company has the right to limit its liability by including those limitations in the policy definitions. If those definitions are clearly stated and unambiguous, the insurance company is entitled to have those terms enforced.

Cornhusker Cas. Co. v. Farmers Mut. Ins. Co. of Nebraska, 268 Neb. 168, 175, 680 N.W.2d 595, 600 (2004) (quoting Safeco Ins. Co. of America v. Husker Aviation, Inc., 211 Neb. 21, 27, 317 N.W.2d 745, 749 (1982)). "Parties to an insurance contract may contract for any lawful coverage, and an insurer may limit its liability and impose restrictions and conditions upon its obligations under the contract if the restrictions and conditions are not inconsistent with public policy or statute." City of Scottsbluff v. Employers Mut. Ins. Co., 265 Neb. 707, 711, 658 N.W.2d 704, 708 (2003).

The Rider contained in the Bond at issue in this case provides coverage for–

> Loss resulting directly from the Insured's having, in good faith and in the course of business in connection with any Loan, accepted or received or acted upon the faith of any real property mortgages . . . or like instruments . . . which prove to have been defective by reason of the signature thereon of any person having been obtained through trick, artifice, fraud or false pretenses . . .

(Filing 26.)  By its plain language, the Rider requires the presence of five factors before coverage applies: (1) the insured acted in good faith and in the course of business, (2) the insured suffered a loss, (3) the loss was caused by the insured's reliance on a mortgage or other instrument relating to mortgages, (4) the mortgage or

instrument is defective, and (5) the defect was caused by a signature on that mortgage or instrument being obtained by fraud. *See Federal Deposit Insurance Corporation v. Firemen's Insurance Co. Of Newark, New Jersey, 109 F.3d 1084, 1088 (5th Cir. 1997)* (interpreting a fraudulent mortgage rider as requiring the satisfaction of these elements ). Hartford does not deny that TierOne has satisfied the first four elements required for coverage. Hartford's motion for summary judgment is predicated on its claim that the fifth element is lacking. I agree.

TierOne bases its claim for coverage on its contention that DePaola was defrauded into thinking that he had obtained title to the properties and that his signature on the deeds of trust would convey an interest in the properties to TierOne. (Filing 32, Br. Supp. Pl.'s Mot. Summ. J. at CM/ECF p. 16.) TierOne argues that DePaola would not have signed the deeds of trust had he known that he did not own the properties. (Id.) In response to this argument, Hartford maintains, in part, that DePaola was part of the fraudulent activities relating to the ownership of the properties and, thus, the loss is not covered. (Filing 34, Br. Opp'n Pl.'s Mot. Summ. J. at CM/ECF pp. 9-12.) It is clear that there is no coverage under a fraudulent mortgage rider where the signatory was part of the fraudulent undertaking. *See Jefferson Bank v. Progressive Casualty Insurance Co.*, 965 F.2d 1274 (3d Cir. 1992) (finding that there was no coverage under a fraudulent mortgage rider because the invalid notary signature on the mortgage was not obtained by fraud, but was part of the fraud when the purported notary was an imposter and not a notary). However, there is no need to take part in a lengthy discussion of the evidence on this point. Even assuming, for purposes of this opinion, that DePaola was not involved in the scheme undertaken by Hawkins, coverage would not exist under the Bond.

Contrary to TierOne's assertion, coverage does not automatically apply when a covered instrument, such as a deed of trust, contains a fraudulently induced signature. Rather, in order for coverage to exist, there must be some showing that the signature is invalid or defective because the signatory was tricked or defrauded as to

10

the nature of the document signed. Courts examining this issue have consistently reached this conclusion. Denying coverage under a fraudulent mortgage rider, the court in *[North Jersey Sav. & Loan Ass'n v. Fid. & Deposit Co. Of Md., 283 N.J. Super. 56, 82, 660 A.2d 1287, 1300 (N.J. Super. Ct. Law Div. 1993)](#)*, stated that "[t]here is a distinction . . . between a fraudulent scheme and a fraudulently induced signature. A mortgage may have been induced by fraudulent acts, but the signature may be valid . . . There is no evidence that any mortgagor . . . did not realize he was signing a mortgage." Similarly, in *[Jefferson Bank v. Progressive Casualty Insurance Co., 965 F.2d 1274 (3d Cir. 1992)](#)*, the court stated as follows with respect to a fraudulent mortgage rider:

> The Rider thus would cover bank losses resulting when the seller of real property fraudulently induces the mortgagor to . . . sign a mortgage by promising that the mortgage will never be enforced, by misrepresenting to the mortgagor that the mortgage covers a different piece of property, or by telling the mortgagor that the document being signed was a contract to purchase rather than a mortgage.

*[Id.](#)* at 1280.

Therefore, to bring this loss within the language and purpose of the Rider, TierOne would have to demonstrate that DePaola's signatures were invalid because he did not understand that he was signing deeds of trust. This allegation has not been made by TierOne and is contrary to the undisputed facts of this case. ([Filing 27.](#))

This court's conclusion is consistent with a recent decision rendered by the Eighth Circuit Court of Appeals. In *[Ohio Savings Bank v. Progressive Cas. Ins. Co., 521 F.3d 960 (8th Cir. 2008)](#)*, the Eighth Circuit Court of Appeals denied coverage under a fraudulent mortgages insuring agreement similar to the one at issue in this case. In *Ohio Savings Bank*, borrowers signed notes and mortgages that were assigned to Ohio Savings Bank ("OSB") and OSB then issued funds to an escrow

11

account for the closing agent.  When the funds were fraudulently diverted out of the escrow account and not used to pay off the borrowers' prior mortgages, the borrowers refused to pay OSB for the loans.  OSB argued that the loss was covered because the borrowers' signatures were fraudulently obtained as they believed that the loan proceeds would be used to satisfy their existing loans.  *Id.* at 963.  The court, in interpreting the fraudulent mortgage insurance agreement ("FMIA"), stated:

> Recognizing that the FMIA is a narrow exception to the bond's exclusion of loan losses, we conclude that a mortgage 'defective by reason of the signature thereon' is one that fails to provide the promised security interest in real property because the mortgagor was tricked or defrauded as to the nature of the document being signed.  A hidden defect of this kind, one that bars recovery by a holder in due course under commercial law and strips a mortgage of its essential nature, is the rare type of fraud one would expect an exception to the broad exclusion to encompass.

*Id.*  Because the borrowers knew that they were signing mortgages that would encumber their property, the court denied coverage.

There is no evidence in this case that DePaola's signatures on the deeds of trust are defective.  It is undisputed that DePaola's signatures are authentic and were voluntarily obtained.  (Filing 27.)  There is also no question that DePaola knew that he was signing deeds of trust.  (Id.)  Eighth Circuit precedent dictates that coverage does not exist when both of the foregoing factors are present.  *See Ohio Savings Bank, supra.*  Accordingly, there is no coverage under the Bond for TierOne's losses and Hartford is entitled to summary judgment.

IT IS ORDERED:

1. Hartford's motion for summary judgment (filing 28) is granted;

2. TierOne's motion for partial summary judgment (filing 30) is denied;

3. By separate document, judgment shall be entered in favor of Hartford and against TierOne, providing that TierOne shall take nothing and the complaint is dismissed with prejudice.

December 9, 2008.

                                      BY THE COURT:
                                      s/*Richard G. Kopf*
                                      United States District Judge